744 S.E.2d 269

**In re Name Change of JENNA A.J.**

**No. 11–1694.**

Supreme Court of Appeals of
West Virginia.

Submitted April 17, 2013.

Decided May 20, 2013.

Dissenting Opinion of Justice Workman
May 21, 2013.

**160**

Suzanne Weise, Esq., James Fogartie, Student Attorney, Andrew Felts, Student Attorney, WVU Child and Family Law Clinic, WVU College of Law, Morgantown, WV, for Petitioner.

Jessica L. Miller, pro se.

LOUGHRY, Justice:

Petitioner Jim J. appeals from the November 9, 2011, order of the Circuit Court of Monongalia County, granting the name change that the respondent Jessica M. had sought for Jenna A.J.,[1] the minor daughter of the parties. After initially seeking to change Jenna's surname from the petitioner's surname, which she took at birth, to the respondent's surname,[2] Jessica M. amended the name change petition to request a hyphenated surname for Jenna A.J. just before the hearing[3] in this matter. After hearing testimony from both the petitioner and the respondent, the trial court issued its ruling in favor of the requested hyphenated name change.[4] In challenging the lower court's ruling, the petitioner argues that the trial court failed to properly apply the standard which governs a name change request. While the respondent did not file a brief before this Court, during the oral argument of this matter she argued that the petitioner did not show, either below or at the appellate level, that the name change injured him.[5] Upon our careful review of the record submitted in this matter in conjunction with applicable law, we find that the trial court committed error in granting the name change and, accordingly, reverse.

---

1. Consistent with our longstanding practice in sensitive matters, we use initials to identify the parties rather than their full surnames. *See In the Matter of Jonathan P.,* 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

2. The parties in this case were never married.

3. The hearing was held on October 11, 2011. Jessica M. appeared *pro se* at that hearing as well as in the proceedings before this Court.

4. Under the court's ruling, Jenna's surname would be comprised of the mother's surname followed by the father's surname.

5. *See* W.Va.Code § 48–25–103 (2009) (providing that name change may be ordered upon finding that "no injury will be done to any person by reason of the change ... [and] that reasonable and proper cause exists for changing the name").

## I. Factual and Procedural Background

On August 30, 2011, Jessica M. filed a *pro se* Petition for the Name Change of Jenna A.J. The grounds identified in the petition as support for the name change were that the petitioner was "no longer willing to participate fully in the child's life" and that the respondent was "the sole provider for the child." Based on these two allegations, the respondent declared that she wanted Jenna A.J. "to have the same name as her mother."

In response, the petitioner[6] submitted a memorandum in opposition to the name change request. In explanation of his request for a hearing on the petition, Jim J. stated that "he is a party likely to be injured by the change of his daughter's name." In addition, the petitioner argued that Jessica M. had failed, through the filing of the petition, to provide any evidence that the alteration of the child's surname would significantly advance the best interests of Jenna A.J.

On the day of the hearing, the respondent, who proceeded on her own behalf, presented the circuit court with an Amended Petition for Name Change. Through the amended petition, Jessica M. altered her initial request to instead seek a hyphenated surname and provided the following explanation:

> The reason for having M[.] added is so my child will not be confused by having a different last name then [sic] mine. Jenna has always and will continue to be supported and cared for by me. Her biological father, Mr. J[.], and I were never married and will never marry; therefore she will be living in a M[.] household with me. Mr. J[.] only financially supported Jenna after being court ordered to do so. As of this day he has never been current with his child support payments. He never visited on a regular basis until the court directed such visits even though I always tried to set up regular visits without involving the courts. I do not see any reason that changing her name will injure Mr. J[.] but keeping it as is, will only cause confusion for Jenna.

After testifying that she was not seeking the name change for any improper or illegal purpose, Jessica M. informed the trial court that she wanted Jenna A.J. to have her surname because the parties had never married and, since the parties separated,[7] she had been her daughter's sole provider. When the circuit court inquired specifically as to how the name change would be in the best interests of Jenna A.J., the respondent testified that "I think it'll just make it easier for her" when she gets into school if she has both of her parents' names. Upon further questioning by the trial court, the respondent stated that the petitioner had not been active in Jenna A.J.'s life until she went to court for purposes of seeking child support.

When the petitioner was permitted to offer his testimony, he stated that he had reduced his child support arrearage to $249.[8] He indicated that he was enjoying the time that he spends with Jenna A.J., but testified about several verbal altercations he had experienced with the respondent in connection with exercising his visitation rights.[9] When the respondent directly questioned him as to how the proposed hyphenated name change would cause him injury, Jim J. testified "[t]o be honest I don't really know Ms. M[.] anymore." Continuing, he stated:

> you know, she wants to modify my daughter's name in any way therefore she wants to do more and I'm just afraid of that, you know, if this was the issue when she was born then we should have addressed it then not years after when she's upset and now she wants to, you know, continuously do radical things. . . .

In its ruling of November 9, 2011, the trial court recognized that "while Mr. J[.] is currently in arrears with regard to his child support obligations, he is working to satisfy those obligations, and he is currently engag-

---

6. In contrast to the respondent, the petitioner was represented by counsel throughout the name change proceedings.

7. The respondent indicated that the separation had occurred more than one year prior to the hearing date.

8. He stated that it was initially $1200.

9. According to the petitioner, these verbal arguments concerned unpaid child support.

ing in visitation with young Jenna pursuant to a Temporary Parenting Plan entered by the Monongalia County Family Court." Accordingly, the circuit court concluded that the petitioner was "exercising his parental rights and discharging his parental responsibilities." After observing that the petitioner "does not specifically articulate the harm that he will suffer" from the proposed name change, the trial court ruled as follows:

> [T]he Court does not perceive any harm befalling Mr. J[.] as a result of the name change requested pursuant to Ms. M[.]'s amended petition. Had Ms. M[.] remained steadfast in her effort to eliminate the child's paternal surname, the Court may very well have reached a different conclusion in this case. The hyphenated surname ... adds the maternal surname; it does not eliminate the paternal surname. Therefore, Mr. J[.]'s protectable interest, as this Court sees it, remains protected.
>
> Additionally, the Court finds that Ms. M[.] has, in fact, satisfied her burden under *Harris*, and has shown by clear, cogent, and convincing evidence that the proposed, hyphenated name will significantly advance young Jenna's best interests.[10]

It is from this ruling that the petitioner now seeks relief.

## II. Standard of Review

■ We articulated the applicable standard of review in syllabus point two of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997):

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

With this standard in mind, we proceed to determine whether the lower court committed error in granting the name change sought by the respondent in this case.

## III. Discussion

■ More than thirty-five years ago, this Court first addressed the standard to be employed when a parent seeks to effect a name change for his or her child. In syllabus point three of *In re Harris*, 160 W.Va. 422, 236 S.E.2d 426 (1977), we set forth the following rule:

> Children bear the surnames of their fathers by custom and usage in this society, and where a father who has exercised his parental rights and discharged his parental responsibilities is dead, or a living father exercises his parental rights and discharges his parental responsibilities, the name of a minor child cannot be changed from that of the father unless upon proper notice and by clear, cogent and convincing evidence it is shown that such change will significantly advance the best interests of the child.

The petitioner argues that the respondent failed to satisfy her burden under *Harris* and its progeny.

By statute, "[a]ny person desiring a change of his own name, or that of his or her child, may apply to the circuit court or family court of the county in which he or she resides...." W.Va.Code § 48–25–101 (2009).[11] Any person who objects to a proposed name change may oppose the application by alleging injury or by asserting other grounds of harm. *See id.* § 102; *see also* W.Va.Code § 48–25–101 (precluding convicted felons and registered sex offenders from securing name changes and denying applications sought for purpose of avoiding debt or creditors and state or federal identity laws). Before a name change can be granted, the circuit or family court is required to ascertain that there are no statutory prohibitions to the name change; that reasonable and proper

---

**10.** The trial court further opined: "Based upon the circumstances underlying this case, it appears highly unlikely that Jenna will grow-up and develop a familial identity within a nuclear or traditional family setting. By her new name, Jenna will be better able to identify herself as a member of her paternal *and* maternal families." (emphasis in original).

**11.** The statutory provisions governing name changes were previously codified at West Virginia Code § 48–5–1 to –7 (1996).

cause exists for the name change; and that there is no fraudulent or evil intent underlying the application. *See* W.Va.Code § 48–25–103 (2009).

■ Melding the statutory requirements for a name change with the need to impose a standard for reviewing such applications, we held in syllabus point two of *Lufft v. Lufft*, 188 W.Va. 339, 424 S.E.2d 266 (1992), that "[w]hen a name change involves a minor child, proof that the change is in the best interests of the child is necessary over and above what is required by W.Va.Code § 48–5–1 *et seq.* (1992)."[12] Crystallizing the evidentiary standard first announced in *Harris*, we held in syllabus point three of *Lufft* that "[a]ny name change involving a minor child may be made only upon clear, cogent, and convincing evidence that the change would significantly advance the best interests of the child." 188 W.Va. at 339, 424 S.E.2d at 266, syl. pt. 3.

At first glance, the ruling at issue suggests that the trial court properly applied the applicable standard. In granting the name change application, the trial court concluded that Jessica M. "has shown by clear, cogent, and convincing evidence that the proposed, hyphenated name will significantly advance young Jenna's best interests." Upon further examination, however, the circuit court revealed that its decision was shaped by an assumption that a different and, arguably, more lenient standard applied to this case given the respondent's request for a hyphenated, rather than outright, name change. This is clear from the trial court's observation that "[h]ad Ms. M[.] remained steadfast in her effort to eliminate the child's paternal surname, the Court may very well have reached a different conclusion in this case." The implication from this statement is that the respondent would have had to produce additional evidence to convince the trial court that a name change to her surname was warranted.

■ By implying that a sliding scale applies in terms of the evidence necessary to secure a hyphenated name change, as compared to an outright surname change, the trial court was misguided. This Court has never adopted a different evidentiary standard based upon the nature of the name change sought. As we sought to make clear in syllabus point three of *Lufft*, *all* name change applications involving a minor child, including those that involve the use of two hyphenated surnames, may be made only upon a showing of clear, cogent, and convincing evidence that the name change will significantly advance the best interests of the child. *See id.*

■ In reviewing the record submitted in this case to determine whether the trial court committed error, we are troubled by the paucity of evidence that was admitted in this case in support of the proposed name change. And given the timing of the request,[13] we are concerned that, as we cautioned against in *Lufft*, the name change may have been sought for improper purposes. *See* 188 W.Va. at 342, 424 S.E.2d at 269 (observing that "[t]he time frame makes this request for a name change look suspiciously like an attempt to anger the appellant"). Quite frankly, the trial court's ruling has more grounds offered in justification of the name change than the record itself discloses.[14] At best, the record demonstrates the mother's preference for her daughter to have a hyphenated surname based on the perceived benefits to be realized in the future when she is of school age. Currently, however, the record simply does not disclose the necessary degree of "clear, cogent, and convincing evidence that the name change would significantly advance the best interests of the child." *Lufft*, 188 W.Va. at 339, 424 S.E.2d at 266, syl. pt. 3.

### IV. Conclusion

Based on the foregoing, we are compelled to conclude that the Circuit Court of Monon-

12. As noted above, the name change statutes that were previously set forth at West Virginia Code § 48–5–1 to –7 now appear at West Virginia Code § 48–25–101 to –107.

13. The name change petition was filed during the same time that the parties were engaged in pro-

ceedings that initially pertained to visitation and now have been expanded to include custody.

14. And while we recognize the respondent's lack of representation may account for this dearth of evidence, we are still required to find the necessary evidence to support the name change.

galia County erred in its decision to grant a name change to the minor child in this case. Accordingly, the case is reversed.

Reversed.

JUSTICE WORKMAN dissents and reserves the right to file a dissenting opinion.

WORKMAN, Justice, Dissenting:

I dissent both from the Court's judgment in this case and from most of the majority's reasoning. The decision of the circuit court was well within its discretion and I see no principled basis on which to overturn it; this Court has, in effect, re-weighed the evidence, utilizing certain hard-and-fast rules, tests and presumptions we have previously mandated in our seminal name change cases, *In re Harris*, 160 W.Va. 422, 236 S.E.2d 426 (1977), and *Lufft v. Lufft*, 188 W.Va. 339, 424 S.E.2d 266 (1992).[1] In my view, with respect to those cases, this Court's opinion in *Harris* has long since outlived its judge-made sociological underpinnings, and our opinion in *Lufft* is a textbook example of the adage that hard cases make bad law. In short, our precedents are outmoded and completely unmoored from what should be the focus in these cases: the best interests of the child, taking into account the realities of the child's living circumstances. Finally, in this latter regard, I urge this Court to join the growing number of jurisdictions that have abandoned hard-and-fast rules and tests in favor of an approach wherein a broad number of factors are examined and weighed in determining whether a name change is in the best interests of a child.

I begin with this Court's precedents. In *Harris*, Cynthia Louise Harris, who was divorced from James Edward Harris, Jr., sought to change her surname and that of her minor child to Struble, Ms. Harris' maiden name. The circuit court denied relief, and Ms. Harris appealed. This Court prefaced its discussion by noting that it had granted the appeals "in order to settle the law in this State on the right of a divorced woman with minor children to change her name and the right of the guardian of a minor child to have the child's name changed." 160 W.Va. at 423, 236 S.E.2d at 427. With respect to the first issue, the Court arrived at what today seems the unremarkable conclusion that because West Virginia Code § 48–5–1 (1969) gives *any* person the right to change his or her name, the statute cannot be read to exclude a divorced woman with children from its ambit.[2] With respect to the second issue, the Court wrote that

> [a] father's interest in having his children bear his name is a valuable and protectable interest, although it is not a property right nor such an interest as cannot be taken away from the parent, if the best interest of the child will be served. The law imposes upon a male parent an obligation to support his children while both morality and social convention demand that a father concern himself with the welfare of his children even if he is divorced from the children's mother and does not have custody of the children. Long-standing social convention has made the surname of a child the same as that of the father.

160 W.Va. at 426, 236 S.E.2d at 429 (internal citations omitted).

The Court then went on to enumerate the financial and reputational assets that a child might enjoy by virtue of sharing his or her

---

**1.** Although not the basis for this dissenting opinion, I take issue with the majority's conclusion that for purposes of this Court's analysis in a name change case, a petition seeking to hyphenate a child's surname is no different from a petition to change the child's surname entirely. In the former circumstance, presented in both *Harris* and *Lufft*, one parent is confronted with the elimination of his or her surname altogether; in the latter, the parent's surname is sought to be joined with that of the other parent. *E.g., Andrews v. Andrews*, 235 Neb. 170, 454 N.W.2d 488, 491 (1990) ("Consequently, the proposed and requested change in the children's surname ... reflects both maternal and paternal surnames.").

I believe that where hyphenation, rather than elimination, of a name is sought, this is one of many factors to be considered in deciding whether a name change petition should be granted. See text *infra*.

**2.** The circuit court had denied Ms. Harris' request for restoration of her maiden name because West Virginia Code § 48–2–23 (1969), in existence at that time, provided that in an annulment or divorce proceeding, a woman's maiden name could only be restored if she had no living children.

father's surname, not to mention "a substantial edge in life when [the child] seek[s] credit, employment, or admission to tightly controlled union, trade or professional groups[,]" concluding that "[o]f course, all of these benefits could *theoretically* pass through the female line as well as the male line, but it is not customary." *Id.* at 427, 236 S.E.2d at 429 (emphasis added).

The Court then held, based on the existence of a father's "protectable interest in his children bearing his surname [which is] one *quid pro quo* of his reciprocal obligation of support and maintenance[,]" *id.*, that

> where a father is supporting his child, takes an interest in the child's welfare, and is *in any way* performing the parental responsibility which both the law and social norms impose upon him, or where a father who has exercised his parental rights and discharged his parental responsibilities is dead, the name of the child may not be changed absent a showing by clear, cogent, and convincing evidence that such change will significantly advance the best interests of the child.[3]

*Id.* at 427–28, 236 S.E.2d at 429 (emphasis and footnote added).

Thirty-six years later, the best that can be said about the Court's exegesis on historical patronymic custom and the rights of male parents is that it is outdated. In fact, the Court's analysis in *Harris* is downright anachronistic; "[t]o the extent the father's objection [to a name change] was based on traditional values, meaning that it is Anglo–American custom to give a child the father's name, the objection is not reasonable, because neither parent has a superior right to determine the surname of [a] child." *In the Matter of Eberhardt*, 83 A.D.3d 116, 123, 920 N.Y.S.2d 216, 221 (2011). Further, most of

the Court's sociological assumptions in *Harris*, such as its lengthy description of possible benefits flowing to children by virtue of carrying their fathers' surnames, although not their mothers', appear to have been created from whole cloth.

Any law based on an analysis which the Court itself categorizes as "descriptive, not normative," is law based on a shaky foundation and deserving of little if any weight as precedent. Times have changed. In 2013, a significant percentage of children in this country reside in single-parent households; a significant number are born to parents who have never been married; and society recognizes that mothers, as well as fathers, have surnames that convey benefits, both financial and otherwise, to their children. Further, in 2013, the idea that only a father has a "protectable interest in his children bearing his surname"—even if he's dead—is jarring.[4]

I believe that *Harris* should be overruled or, failing that, quietly interred on the basis that "facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification[.]" *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citation omitted). Where, as in this case, the mother and father have never been married, the mother has always had custody of the child, the father's decision to finally bring his child support up to date occurred just in time for hearing on the mother's request for a name change, and the mother wants nothing more than to hyphenate the child's name, not erase the father's name completely, any application of the anachronistic decision in *Harris* is unfounded and unjust. Here, as in *Eberhardt*, the father's "objection must relate to the child's best interests or bear on the

---

3. The only example given by the Court of a circumstance in which a name change *might* be granted was where the father was "a notorious criminal" whose surname would create "such a stigma or embarrassment that the child's mental health would be jeopardized or his or her opportunities in life narrowly circumscribed." 160 W.Va. at 428, 236 S.E.2d at 429–30.

4. As cogently stated by the Supreme Court of California in *In re Schiffman*, 28 Cal.3d 640, 169

Cal.Rptr. 918, 620 P.2d 579, 583 (1980) (en banc),

> the changing family patterns that are recognized and encouraged by the Uniform Parentage Act support the conclusion that once-accepted assumptions about 'family identity' and 'noncustodial fathers' are losing force. To the extent that understandable concerns do arise in particular cases cannot they be fully considered in the context of the 'child's best interest' test?

parent's relationship with the child, and the father failed to articulate, nor could he, how the patronymic custom was relevant to either of those concerns." 83 A.D.3d at 123, 920 N.Y.S.2d at 221.

In *Lufft*, this Court was presented with a case that can be described as the flip side of *Harris:* the parties' child had carried her mother's name from birth, and the father sought to have her surname changed to his own, asserting, *inter alia,* that the child's use of her mother's name meant that "she would be tarred forever with the stigma of illegitimacy." *Lufft*, 188 W.Va. at 340, 424 S.E.2d at 267. A family law master granted the father's request, the circuit court adopted the law master's recommendations, and the mother appealed. This Court reversed, acknowledging (in a masterpiece of understatement) that "the *Harris* case was weighted toward the child retaining the father's surname," *id.* at 342, 424 S.E.2d at 269, but concluding that "it is equally applicable to any name change, including one changing a child's last name from the mother's maiden name to the father's surname." *Id.*

This Court noted that the father had never made a request for a name change until divorce proceedings were filed,[5] making "this ... look suspiciously like an attempt to anger the [mother]." *Id.* After quickly dismissing the father's illegitimacy argument, the Court held that "any name change involving a minor child [may] be made only upon clear, cogent, and convincing evidence that the change would significantly advance the best interests of the child." *Id.* Finding that the father had presented no such evidence, the Court reversed the circuit court, finding "no reason to change the child's name." *Id.* Significantly, the Court also remanded the case with directions that the family law master examine whether the father's visitation of his child should be supervised, in light of the father's history of physical violence not only to the mother (whom he had battered in front of the child) but also to his current girlfriend.

A careful examination of *Lufft* leads inexorably to the conclusion that hard cases make bad law. The facts in *Lufft* were about as "hard" as facts can be: the father was a violent, abusive individual who had no interest whatsoever in his child bearing his name until divorce proceedings arose, whose motive was clearly one of retaliation, and whose only argument was an illusory "stigma of illegitimacy."[6] In response to these facts, this Court established an extraordinary high standard of proof for all name change cases involving children, a standard that has heretofore been utilized only in cases involving constitutional rights and/or personal or property rights so firmly established in the law as to be presumptive. *E.g.,* Syl. Pt. 3, *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995) (clear, cogent and convincing evidence required to defeat presumption of gift to the marital estate, where the separate property of one spouse used to pay joint obligation); Syl. Pt. 3, *Belcher v. Terry*, 187 W.Va. 638, 420 S.E.2d 909 (1992) (clear, cogent and convincing evidence of employer's knowledge of obligor's intention to evade child support required to hold employer liable for failure to withhold support); *State v. McWilliams*, 177 W.Va. 369, 379, 352 S.E.2d 120, 130 (1986) (clear and convincing evidence required to support involuntary civil commitment); Syl. Pt. 2, *Wheeling Dollar Sav. & Trust Co. v. Singer*, 162 W.Va. 502, 250 S.E.2d 369 (1978) (clear, cogent and convincing evidence of equitable adoption required to defeat legatee's entitlement); Syl. Pt. 6, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) (clear, cogent and convincing evidence required to support termination of parental rights); Syl. Pt. 2, *Beckley Nat. Exch. Bank v. Lilly*, 116 W.Va. 608, 182 S.E. 767 (1935) (clear and convincing evidence required to defeat one's

5. The parents were married a year and a half after their child was born, and the marriage lasted less than six months.

6. The facts in *Lufft* are similar to those in *Wilson v. McDonald*, 393 S.C. 419, 713 S.E.2d 306 (Ct. App.2011), where an unmarried, uninvolved father sought to force a name change after being served with a suit seeking child support. Noting that South Carolina law requires the parent seeking a name change to "prov[e] the change furthers the child's best interests[,]" the *Wilson* court identified nine non-exclusive factors to be considered, *id.* at 308, and not surprisingly concluded that the father had failed to meet most of them.

property rights by another's establishment of easement by prescription).

That the evidentiary bar set in *Harris* and *Lufft* is unreasonably high became starkly apparent in this Court's next name change case, *In re Carter*, 220 W.Va. 33, 640 S.E.2d 96 (2006), where respondent mother petitioned on behalf of her fifteen-year-old son to change the boy's surname to that of his stepfather. The son testified that he desired the name change, that his stepfather "was the only father he had ever known and that he did not have any memories of his biological father[,]" and that he wanted to have the same surname as his mother, sister and stepfather. 220 W.Va. at 34, 640 S.E.2d at 97. The circuit court ruled in favor of the mother and son, finding that although the biological father had paid court-ordered child support, the following facts were more than sufficient to support the requested name change:

> Mr. Carter had not visited or contacted his son for more than thirteen-and-one-half years; had not maintained health insurance coverage for his son as ordered by the court; had not shared equally the costs of health care not covered by insurance as ordered by the court; had not telephoned his son or sent his son Christmas presents or cards; had never sent his son a birthday card or present; and made no attempt whatsoever to communicate with his son.

*Id.* at 35, 640 S.E.2d at 98.

Notwithstanding these facts,[7] which may not establish abandonment but come perilously close,[8] this Court reversed the circuit court's judgment, concluding that because the biological father "ha[d] not abandoned *all* duties of a father[,]" the essence of the test in *Harris*, the circuit court had abused its discretion in granting the request for a name change. *Id.* at 37, 640 S.E.2d at 100 (empha-

sis supplied). In light of the circuit court's findings of fact, which were not disputed, one can only ask: if this wasn't clear and convincing evidence under *Harris* and *Lufft*, what could be? Evidence that the parent seeking a name change is a "notorious criminal," *Harris*, 160 W.Va. at 428, 236 S.E.2d at 429, the only exception to the hard-and-fast rule suggested in that case?

Finally, in *In Re Ashworth*, No. 101218 (W. Va. filed February 11, 2011) (memorandum decision), this Court summarily rejected the appeal of a putative father—one who exercised visitation with his child, paid child support, and did not have any of the unsavory "baggage" associated with Mr. Lufft—who argued that his child's surname should be changed to his own. We held that "[w]hether the name change would significantly advance this child's best interests was within the discretion of the family court," *Ashworth*, No. 101218, slip op. at 2, distinguished *Harris* on the ground that Mr. Harris did not seek a name change but rather sought to have his child *retain* his name, *id.*, slip op. at 1, and ignored *Carter* altogether. Although I believe that *Ashworth* was correctly decided, inasmuch as there was nothing in the record on which to base a finding that the circuit court abused its discretion, it would have been wise for this Court to use the case as a vehicle to address our precedents—which we mentioned only in passing—and establish a more flexible approach to be utilized in name change cases.

In my view, *Ashworth*, not *Harris*, *Lufft* or *Carter*, should be the basis for a new approach for this Court on review of name change cases. Our focus should be on whether the lower court's decision was within its broad grant of discretion, not on our

---

**7.** As aptly summarized by the dissenting justice, the father had "done nothing for [his son] other than that which he had to do to avoid criminal sanction: he paid court-ordered child support in a minimal amount." 220 W.Va. at 38, 640 S.E.2d at 101 (Benjamin, J., dissenting).

**8.** West Virginia Code § 48–22–306(a) (2009) provides in relevant part that

> [a]bandonment of a child over the age of six months shall be presumed when the birth parent:

> (1) Fails to financially support the child within the means of the birth parent; and
> (2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child[.]

See *In re: William Albert B.*, 216 W.Va. 425, 429, 607 S.E.2d 531, 535 (2004); *In re Carey L.B.*, 227 W.Va. 267, 274, 708 S.E.2d 461, 468 (2009).

notions of societal norms and quid pro quo entitlements (payment of child support = naming rights), the underpinning in both *Harris* and *Carter*, and not on our *sub silentio* evaluation of the parents' respective character flaws, as in *Lufft*. These should be factors for the trier of fact to consider as part of the totality of the evidence, but they should not be determinative in and of themselves. Further, we should not be adhering to a standard of proof appropriate to cases involving constitutional rights and long-established personal and property rights; neither parent in a name change case should be entitled to a presumption that the best interests of the child are served by maintaining the status quo. All of the barriers that this Court has erected to prevent changing or hyphenating a child's name take us far away from what should be the lodestar consideration in these cases: whether a name change promotes the best interests of the child in the circumstances of his or her life, a decision uniquely suited to be resolved by the trier of fact.

In the case at bar, the majority gives far too little deference to the circuit court's finding of some key facts: that the petitioner and the respondent have never been married; that the child has always lived with her mother; and that the child was only two years old at the time the name change was sought. Further, the majority has given far too little deference to the circuit court's first-hand observation of the parties' demeanor and testimony.[9] Finally, the majority has indulged in some appellate fact-finding, by picking and choosing among competing inferences which may be drawn from the record. For example, the majority notes that the name change sought by the respondent mother "look[s] suspiciously like an attempt to anger the [petitioner]." If fact-finding were the proper role of this Court, which it is not, I would make note of an entirely different inference: that the petitioner's last-minute attempt to get current on his child support

port looks suspiciously like an attempt to bring himself within the quid pro quo rule of *Harris.*

The trend in other jurisdictions is away from *Harris*-like rules and presumptions, as "many courts have held that neither parent has a superior right in the determination of the surname for the parents' child." *In re Andrews,* 235 Neb. 170, 454 N.W.2d 488, 491–92 (1990) (collecting cases). As explained by the Supreme Court of Ohio in *In re Willhite,* 85 Ohio St.3d 28, 706 N.E.2d 778 (1999),

> '[m]ost scholars agree * * * that the patrilineal system evolved from the medieval property system * * *, [in which] men were the heads of households and owned all property contained in the household, including rights to their wives and children.' Kennedy–Sjodin, *41 S.D.L.Rev. at 175.*[10] 'The trend toward paternal surnames was accelerated by Henry VIII, who required recordation of legitimate births in the name of the father. Thence, the naming of children after the fathers became the custom in England,' and the tradition continued in the colonies. *Schiffman,* 28 Cal.3d at 643, 169 Cal.Rptr. at 920, 620 P.2d at 581. Through the advent of the Married Women's Property Acts, no-fault divorce, and gender-neutral custody statutes, today the rationale for the preference for paternal surname has disappeared. *Id.*

706 N.E.2d at 780 (footnote added).

Significantly, as one examines the analytical basis of *Harris* (which I have previously called "payment of child support = naming rights"), the court in *Willhite* also noted that

> [u]nder the *Newcomb*[11] test, as well as tradition, a child's surname has been a sort of quid pro quo for the father's financial support. We find that this ignores the mother's parallel duty to support the child whether or not she is the residential par-

---

**9.** "We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children." *Sheppard v. Speir,* 85 Ark.App. 481, 157 S.W.3d 583, 588 (2004).

**10.** Shannon J. Kennedy–Sjodin, *Keegan v. Gudahl: The Child's Surname as a New Bargaining Chip in the Game of Divorce,* 41 S.D. L.Rev. 166 (1996).

**11.** *In re Newcomb,* 15 Ohio App.3d 107, 472 N.E.2d 1142 (1984).

ent. Further, it 'reinforce[s] the child-as-chattel mentality by making the child's name a piece of property to be bargained over. Indeed, it rewards the father for doing that which he is already legally, if not morally, required to do. Clearly, the notion of equating the best interest of the child with dollars is no longer reasonable in contemporary society.

*Id.* at 781 (footnote added and internal citations omitted).

Following the modern trend,[12] the *Willhite* court listed the following factors to be considered in a name change case:

> [T]he effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; whether the child's surname is different from the surname of the child's residential parent; the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; parental failure to maintain contact with and support the child; and any other factor relevant to the child's best interest.

*Id.* at 782.

In my view, the approach outlined in *Willhite* is one that should be adopted by this Court. Our precedents may dutifully recite that the cases turn on the best interests of the children, but the fact is that the decisions in *Harris, Lufft* and *Carter* are inextricably linked to the parents' rights. In *Harris,* we determined that virtually all rights belong to the father, so long as he's paying child support; in *Lufft,* we acknowledged (without saying it directly) that no, some fathers are so bad they don't really deserve those rights; and in *Carter,* we went right back to *Harris* and reaffirmed that a father who pays child support—no matter how minimal, no matter

that he hadn't bothered to contact his child for 13½ years, and no matter what the wishes of his child might be—maintains his "naming rights."

Only in *Ashworth* did we eschew any discussion of rights and quid pro quo entitlements; rather, we dispassionately reviewed the circuit court's judgment under an abuse of discretion standard. In the instant case, however, it appears that this Court has gone back to the rules, presumptions and impossibly high evidentiary standards established in *Harris, Lufft* and *Carter,* reversing a well-reasoned decision by a circuit judge who heard the evidence and determined that the respondent mother's request for her child to have a hyphenated surname was in the child's best interests. In so doing, I believe that this Court has failed to do justice in this case. Further, with our decision in this case we have perpetuated a system whereby a child's surname is a quid pro quo for the father's legally mandated financial support—a "child-as-chattel" exchange, *Willhite,* 706 N.E.2d at 781—even where the custodial parent seeks only to add his or her name by hyphenation, not to eliminate the other parent's name. The court below properly treated both child support and hyphenation as factors to be considered, nothing more and nothing less. "[W]here the mother is merely seeking to add her last name and not to eliminate the father's name, the fact that the father supports the child should not preclude the proposed change." *Eberhardt,* 83 A.D.3d at 123, 920 N.Y.S.2d at 220.

For these reasons, I respectfully dissent.

**12.** *E.g., C.B. v. B.W.,* 985 N.E.2d 340, 343 (Ind. Ct.App.2013); *In re T.G.–S.L.,* 2013 WL 43738, at *3 (Tex.App.2013); *M.R.H. v. J.N.P.,* 385 S.W.3d 494, 498 (Mo.Ct.App.2012); *Robertson v. D'Amico,* 2012 WL 833102, at *2 (Cal.Ct.App.2012); *Eberhardt,* 83 A.D.3d at 123–24, 920 N.Y.S.2d at 221; *Andrews,* 454 N.W.2d at 492–93; *Sheppard v. Speir,* 85 Ark.App. 481, 157 S.W.3d 583, 590 (2004); *In re C.R.C.,* 819 A.2d 558, 560–61 (Pa.Super.2003). *See also* 65 C.J.S. *Names* § 24 (2010) (collecting cases).